UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATTHEW NORMAN BALLEK,<br><br>Defendant. | Case No. 24-CR-61 (RBW) |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF**
**PRETRIAL DETENTION OF DEFENDANT MATTHEW NORMAN BALLEK**

The United States of America, by and through its undersigned counsel, respectfully submits this memorandum in support of its motion that Defendant Matthew Norman Ballek be detained pending trial pursuant to Title 18, United States Code, Sections 3142(f)(1)(A) (crime of violence) and 3142(f)(2)(A) (risk of flight). After a federal grand jury indicted Defendant on one count of Distribution of Child Pornography, in violation of Title 18, United States Code, Section 2252(a)(2), (b)(1), Defendant was arrested on February 7, 2024. The government requests that this Court consider the following points and authorities, as well as any information presented at the detention hearing, and order Defendant Matthew Norman Ballek detained pending trial.

**Factual Background**

Leading up to Tuesday, January 23, 2024, a member of the MPD–FBI Child Exploitation Task Force (the "UC") was acting in an undercover capacity from an office located in the District of Columbia. In that capacity, the UC was monitoring an online application that is geared toward gay and bisexual men looking to engage in sexual activity. The application allows users to post messages in a public chat room that is visible to online users and also allows users to message each other privately. The UC has been active on the application for several months and knows that a subset of its users is interested in the sexual exploitation of children and in discussing and trading

child sex abuse material. On Tuesday, January 23, 2024, the UC posted a message in the public chat room indicating that he had an interest in "no limits taboo" and was looking to meet and masturbate in person with individuals who had similar interests. A user, later identified by law enforcement as Defendant Matthew Norman Ballek, initiated a conversation with the UC by sending a private message. Below is a portion of that chat:

**BALLEK:** Hey prv[1]

**UC:** hey how are you

**UC:** how naughty? Limits?

**BALLEK:** Horny

**BALLEK:** no limits except scat and blood

**BALLEK:** Prvy asf

**BALLEK:** U?

**UC:** Same taboo little boy

**BALLEK:** Fuck ya

**UC:** U have material too

**BALLEK:** You looking to bate[2]?

**UC:** where u located

**BALLEK:** Shaw

**UC:** Nice! Chinatown area here

**BALLEK:** Close

**BALLEK:** You hosted groups before?

**UC:** Yes

**BALLEK:** Prving make me rock hard

**UC:** Just like to build trust before so I know everyone cool and on same page

---

[1] "Prv" and "prvy" are misspellings of "perv" and "pervy." Individuals interested in the sexual abuse and exploitation of minors and in child sex abuse material often refer to themselves and their proclivities using these terms.

[2] "Bate" is a slang term that is short for "masturbate."

  **BALLEK:** Shoot big loads

  **BALLEK:** Ya makes sense

  **BALLEK:** [image of an adult male lying in bed exposing his erect penis]

  **UC:** Huge loads

  **UC:** what do you perv to?

  **BALLEK:** [emoji depicting man and boy]

  **BALLEK:** [emoji depicting dog]

  **UC:** mmm fuck yeah, now we on same page

  **UC:** Nothing makes me cum more

  **UC:** U wanna move to wire[3]?

  **UC:** or somewhere else?

  **BALLEK:** I have tele[4]

  **BALLEK:** But just got wire

  **BALLEK:** @f5h7j8

  **BALLEK:** add me

  On Tuesday, January 23, 2024, Defendant continued to communicate with the UC through a private, encrypted "secret chat" on the Telegram platform. During the course of that chat, the UC informed Defendant that he had sexual experience with his purported eight-year-old daughter

---

[3] "Wire" is an end-to-end encrypted communication application. When a chat is end-to-end encrypted, only the participants to that chat can see its contents. Because the application is unable to access the contents of the chat, it is not possible for the application to detect the transmission of child sex abuse material. For this reason, individuals interested in exchanging child sex abuse material frequently prefer to trade such material over communication applications offering end-to-end encryption.

[4] "Tele" is short for "Telegram," another end-to-end encrypted messaging application that is popular with individuals who are interested in sharing child sex abuse material. Telegram has additional features that help individuals conceal their illegal activities. For example, Telegram enables users to participate in a "secret chat," in which, among other things, the application detects and reports within the chat if a participant takes a screenshot or uses the device to take a screen recording of the chat. In addition, Telegram allows a participant in a chat to delete the entire chat (or messages within the chat) not only from his own device but from the devices of other participants.

and a one-year-old boy.  Defendant insinuated that his only sexual experience had been abroad. During the course of the chat, Defendant asked the UC if he had videos.   Below is a portion of that chat:

>**BALLEK:** You got videos?
>
>**BALLEK:** To prv to?
>
>**UC:** I have some original content of mine and a few vids of me perving on her while she was knocked out.
>
>**UC:** What about u
>
>**BALLEK:** I don't keep it.
>
>**UC:** Ah
>
>**UC:** Yeah, I'm only looking for others that also have stuff, to risky otherwise.
>
>**BALLEK:** I can get cp
>
>**BALLEK:** Just not original
>
>**BALLEK:** Is that fine
>
>**UC:** Oh knew u didn't have original I thought u didn't have any cp at all
>
>**BALLEK:** You share your daughter?
>
>**BALLEK:** Or have you
>
>**UC:** I would let another trusted perv play with her like I do, I think it would be hot as fuck. I just don't have her this week.

During the chat, Defendant wrote to the UC, "you need to go abroad with me."  Below is a portion of the continued chat in which Defendant discussed his access to child pornography:

>**BALLEK:** I just cleared my vids but I can find
>
>**UC:** ok
>
>**BALLEK:** I know lots of guys
>
>**BALLEK:** This is a new tele
>
>**UC:** Mmmm u ever perv out with any or just online
>
>**BALLEK:** Perved quite a bit
>
>**BALLEK:** with guys

**UC:** Nice!

**BALLEK:** It's hard to find

**UC:** Yeah it is

**BALLEK:** How do you find?

**UC:** And hard to find others into it that are close

**BALLEK:** Do you party and bate on zoom?

During the course of the chat, Defendant also told the UC that he had met a man for sex through a social media application and that the man's eighteen-month-old son was sexually abused during that encounter. Below is a portion of that chat.

**BALLEK:** played with one dad from grindr

**UC:** Mmmm

**BALLEK:** and his son

**UC:** How old

**BALLEK:** but like light

**BALLEK:** 18 months

**UC:** Mmmmmmmmmm

**UC:** Fuck

**UC:** Love that

**UC:** What he let u do

**BALLEK:** I fucked the dad and he put the boy on his stomach.

**BALLEK:** Rubbed his dick on his hole

**UC:** Mmmmm, sooo hot

**BALLEK:** Rimming

**BALLEK:** No fucking

**UC:** Love to have that connection

**BALLEK:** How long you been pedo

Defendant then wrote to the UC, "Will you trade if I send? I got a guy." Shortly after this statement, Defendant distributed child pornography to the UC, sending him three videos that depict

5

Case 1:24-cr-00061-RBW   Document 7   Filed 02/09/24   Page 6 of 17

adult males raping young boys.  The first video is approximately 36 seconds long and depicts an adult male aggressively inserting his index finger in and out of a toddler boy's anus.  The toddler is heard crying throughout the video.  The second video is approximately 48 seconds long and depicts an adult male penetrating a toddler boy's anus with his penis.  The toddler is heard screaming and crying throughout the video.  The third video is approximately 36 seconds long and depicts an adult male inserting his penis in the anus or buttocks of a prepubescent boy.

Later in the chat, Defendant requested that the UC take a live video of his purported daughter's room.  The UC confirmed the request and asked Defendant his name so that he could say Defendant's name in the video.  Defendant replied, "Matthew."

At some point between Wednesday, January 31, 2024, and Thursday, February 1, 2024, Defendant deleted the chat from both his device and the UC's device.  The UC had memorialized most of the chat – including the child pornography videos – by videorecording the chat with another device.  The portion of the chat that the UC was not able to capture before Defendant deleted it pertained to scheduling a time to meet and did not include additional child pornography.

In response to an administrative subpoena, the application on which Defendant first messaged the UC provided information about his account to law enforcement.  The response indicted that, on Monday, January 15, 2024, the target user upgraded to a premium account using an American Express card with the name "Matthew N Ballek."  The response further indicated that the target user had provided an email address of sx88n2@gmail.com.  It also indicated that the target user had accessed the application from the IP address 71.120.19.250.

Google also provided information to law enforcement in response to an administrative subpoena, which indicated that the email address sx88n2@gmail.com was last accessed on

6

December 13, 2023, from the same IP address (71.120.19.250), and that the user of the account had provided the name "Mark Ball."

The UC reviewed Google search results for the username "sx88n2" and found results from Reddit, an online social network. On Monday, July 11, 2022, a user posting under the username "sx88n2" made a post stating that he had been taking French courses in Ottawa since March 2021 and had moved to Washington, D.C., mid-year. On Thursday, July 13, 2023, the same user made a post that included the following statement: "I'm from rural Saskatchewan and lived in Montreal, Ottawa and the US." The UC then reviewed the publicly visible portions of Defendant's Facebook and Instagram profiles, which are depicted below. The information on the profiles is consistent with the information shared in the Reddit posts made by user "sx88n2." Specifically, the profiles indicate that Defendant is a Canadian national from Saskatchewan, that he attended McGill University (which is in Montreal), and that he lives in Washington, D.C.



The UC also reviewed publicly visible portions of Defendant's LinkedIn profile, a portion of which is depicted below. The profile states that Defendant is currently located in Washington, D.C. The profile further indicates that Defendant worked in Ottawa, which is consistent with the information that "sx88n2" posted on Reddit.



The UC also reviewed information about Defendant obtained from the Department of State. The Department of State indicated that Defendant was issued a G4 visa on June 8, 2021, to work at the World Bank. Defendant posted a photograph of the World Bank's headquarters to Instagram on November 22, 2021, with the caption "new job who dis."

The UC queried a public records database and found a listing for Defendant that included the address "███████ ██████ ███████ █████████ ██████, Washington, D.C. ███████." On February 5, 2024, law enforcement spoke to the owner of that property. The owner confirmed

that Defendant is the leaseholder of the basement apartment in the building. The owner provided a copy of the lease agreement, which was executed on July 10, 2023, and is for a two-year term beginning September 1, 2023, and ending August 31, 2025.

Law enforcement was able to further confirm Defendant's association to this address based on a "selfie" photograph that Defendant sent the UC. The photograph depicted Defendant standing shirtless in a bathroom mirror. Law enforcement viewed public real estate listings for other apartment units in the building and observed that the bathrooms in those photographs had identical design features, to include a textured wall, grey paint, and one-panel doors with lever-style door hardware. The bathroom depicted in Defendant's photograph had these same design features.

## Procedural History

On Thursday, February 1, 2024, a federal grand jury returned a one-count indictment charging Defendant with a violation of Title 18, United States Code, Section 2252(a)(2), (b)(1) (Distribution of Child Pornography), and the Honorable G. Michael Harvey issued an arrest warrant the same day. On Tuesday, February 6, 2024, Judge Harvey issued a search warrant for Defendant's residence. *See* case number 24-SW-32. On Wednesday, February 7, 2024, law enforcement executed the search warrant and arrested Defendant. Later that same day, Defendant made his initial appearance and was arraigned before Judge Harvey. On the government's motion, Defendant was held pending a detention hearing, which is scheduled for Monday, February 12, 2024. The government now respectfully submits this memorandum in support of its motion for pretrial detention.

## Applicable Legal Standard

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [the defendant] as required and the safety of

any other person and the community," the Court shall order the defendant held pending trial. 18 U.S.C. § 3142(e). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). As a threshold matter, the government must demonstrate by a preponderance of the evidence that a defendant is a flight risk, *see United States v. Anderson*, 177 F. Supp. 3d 458, 466 (D.D.C. 2016) (citing *United States v. Xulam*, 84 F.3d 441, 443 (D.C. Cir. 1996)), and by clear and convincing evidence that he is a danger to the community, *see* 18 U.S.C. § 3142(f).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

Here, because Distribution of Child Pornography is a crime of violence involving a minor victim, "[s]ubject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(E). This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"). But even if the defense produces credible evidence, the presumption retains evidentiary weight and is considered by the Court among the Section 3142(g) factors. *See, e.g., United States v. Stone*, 608 F.3d 939, 945 (6th

Cir. 2010) ("Even when a defendant satisfies his burden of production, however, 'the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court.' . . . The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts.  Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001))); *United States v. Ali*, 793 F. Supp. 2d 386, 388 n. 2 (D.D.C. 2011) ("[C]ircuits that have considered the issue require using the presumption as a factor even after the defendant has produced credible evidence.").

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."  18 U.S.C. § 3142(f).  Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer.  *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996).  Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992).  A pretrial detention hearing should not be used as a discovery device.  *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

## Argument

For reasons that follow, Defendant poses an unmitigable risk to community safety and is a flight risk.  Because there are no conditions of release adequate to reasonably assure community safety or Defendant's return to Court, this Court should order Defendant detained pending trial.

### A.  Nature and Circumstances of the Charged Offense

Defendant's alleged conduct in this case is extremely harmful and dangerous to the

11

community. As detailed above, the nature and circumstances of the present offense make clear that this factor weighs heavily in favor of detention because Defendant's criminal conduct involves the sexual exploitation of the most vulnerable members of our community – toddlers and very young children. "Child pornography depicts pictorial evidence of physical sex abuse against and exploitation of children and the production and distribution of such contraband carries a multitude of harms." *United States v. Galarza*, No. 18-MJ-146 (RMM), 2019 WL 2028710, at *6 (D.D.C. May 8, 2019) (Howell, C.J.) (reversing magistrate court's release order); *United States v. Nickelson*, No. 18-MJ-102 (GMH), 2018 WL 4964506 (D.D.C. Oct. 15, 2018) (Howell, C.J.) (same); *United States v. Blanchard*, No. 18-MJ-101 (GMH), 2018 WL 4964505, at *4 (D.D.C. Oct. 15, 2018) (Howell, C.J.) (same). Children captured in images and videos depicting their sexual abuse are significantly harmed at the time that the images and videos are created, and they are re-victimized and re-traumatized every time an individual, like Defendant, views and shares these images for his own sexual gratification and for the sexual gratification of others. *See Galarza*, 2019 WL 2028710, at *6 (noting that "'the perpetual nature of child pornography distribution on the Internet causes significant additional harm to victims,' [who] 'live with persistent concern over who has seen images of their sexual abuse' and how those images are being used to cause additional harm.'" (quoting U.S. SENT'G COMM'N, FEDERAL CHILD PORNOGRAPHY OFFENSES (Dec. 2012) at vii); *Nickelson*, 2018 WL 4964506, at *4 (same); *Blanchard*, 2018 WL 4964505, at *4 (same).

The seriousness of the offense is also reflected by Congress's judgment that those charged with distributing child pornography should be presumed detained pending trial, *see* 18 U.S.C. § 3142(e)(3)(E), and are subject to a five year mandatory minimum term of imprisonment upon conviction, *see* 18 U.S.C. § 2252(b)(1).

Defendant's conduct in this case was particularly egregious in that it involved the distribution of videos depicting the sadistic sexual abuse of toddlers and prepubescent children. As detailed above, the videos, shared by Defendant for purposes of his own sexual gratification, depict extremely young and vulnerable children who are crying in pain as they are being raped by adult men. Indeed, the Sentencing Guidelines recognize the serious nature of the offense that this Defendant is charged with, which include offense-level enhancements for material involving a prepubescent minor, *see* USSG §2G2.2(b)(2), and material that portrays sadistic or masochistic conduct or sexual exploitation of an infant or toddler, *see* USSG §2G2.2(b)(2). The Guidelines provide additional enhancements for engaging in the knowing distribution of such material, *see* USSG §2G2.2(b)(3)(F), for using a computer or interactive computer service to do so, *see* USSG §2G2.2(b)(6), and for the number of images, *see* USSG § 2G2.2(b)(7)(B). Based on the conduct known to the government at this early stage of the case, the government estimates Defendant's total Offense Level under the Guidelines to be 33, yielding an estimated Guidelines range of 135 to 168 months' imprisonment (i.e., approximately 11.25 to 14 years' imprisonment), which further reflects the very serious nature of the offense conduct.[5] Accordingly, the nature and circumstances of Defendant's offense weigh heavily in favor of detention.

### B. The Weight of the Evidence Against the Defendant

The second factor to be considered, the weight of the evidence, also weighs heavily in favor of detention. The evidence against Defendant in this case is extremely strong. As detailed above, Defendant discussed his sexual interest in children at length with an undercover police officer and

---

[5] The mandatory-minimum term of imprisonment and lengthy Guidelines range provide incentive for Defendant—who has never previously served a term of imprisonment—to flee prosecution. Those concerns are particularly acute here, where Defendant, who is a Canadian national present in the United States on a G4 visa to work for the World Bank—lives alone and has no known ties to the community beyond his employment, the status of which is uncertain at this time.

13

then purposefully distributed three videos to the UC depicting the sadistic sexual abuse of toddlers and prepubescent children. Law enforcement was subsequently able to link the account with which Defendant first contacted the officer to Defendant in multiple ways: he paid for it with a credit card in his name; the email address associated with the account contains a unique username, and Defendant posted unique, identifying information to Reddit using the same username; and Defendant sent a shirtless photo to the UC that appears to have been taken in the bathroom of his known residence.

While some judges in this Court have indicated that this factor should be given less weight, in *United States Blackson*, following a thorough review of the text of Section 3142 and decisions analyzing this factor, then–Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." No. 23-CR-25 (BAH), 2023 WL 1778194, at *8 (D.D.C. Feb. 6, 2023) (Howell, J.). Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed then–Chief Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149–150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang*; this factor should be given no less weight than any other factor.

Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself

14

or the community if the government's allegations later prove to be true." *Blackson*, 2023 WL 1778194, at *10. This is such a case, and Defendant should be detained pending trial.

### C. The History and Characteristics of the Defendant

Although Defendant has no known criminal history, he has admitted to the undercover officer in this case that he has a long-standing sexual interest in children and that he has acted on this sexual appetite in the past. Specifically, Defendant admitted that he participated in the sexual abuse of a toddler whose father he met on the social media app "Grindr." Defendant also asked the undercover officer if he would "share" his purported eight-year-old daughter, in an apparent attempt to engage with the officer in acts of sexual abuse against this child. He also implied to the undercover officer that he has engaged in the sexual abuse of children "abroad" and commented to the officer that he should "go abroad" with him in order to engage in sexual acts with children outside the legal protection of the laws of the United States.

In addition, Defendant sought to conceal his identity, his illicit conversations, and his illegal distribution of child pornography by using an end-to-end encrypted messaging application. He then tried, unsuccessfully, to cover his tracks by deleting the conversation from the UC's device. His conduct is concerning because he was obviously conscious that the distribution pornography is unlawful and, after taking relatively sophisticated steps to make his illegal conduct harder to detect, engaged in it anyway.

Moreover, Defendant is a Canadian citizen present in the United States on a G4 work visa and will be subject to removal upon conviction of the charges in this case. He stated to Pretrial Services that he is single and that he lives alone, information that is consistent with statements made by Defendant's landlord and his lease agreement. Given Defendant's status as a foreign citizen and his apparent lack of family or other ties to the United States, and in light of the

15

significant prison sentence that Defendant is likely to face if convicted, Defendant poses both a serious danger to the community and a serious risk of flight.[6] Accordingly, this factor also weighs in favor of detention.

### D. The Nature and Seriousness of the Danger to any Person or the Community

The facts and evidence in this case establish that Defendant poses a grave danger to the community. As discussed above, the distribution of child pornography presents a serious danger to the community because it results in severe mental, emotional, and physical trauma to the children who are victimized by offenders such as Defendant, who seek to achieve sexual gratification through viewing and sharing of images depicting the sexual abuse of children. Defendant, as a consumer and trafficker of this abhorrent material, furthers the demand for new material depicting the graphic sexual exploitation and sexual abuse of vulnerable children. It is precisely "[t]hese significant harms and dangers [that] animated the Congress to create the statutory presumption of detention in these cases." *Galarza*, 2019 WL 2028710, at *7; *Nickelson*, 2018 WL 4964506, at *5 (noting also Congress's creation of significant statutory mandatory minimum penalties); *Blanchard*, 2018 WL 4964505, at *4 (same).

As described above, Defendant here has not only engaged in the distribution of sadistic child pornography material depicting extremely vulnerable toddlers and young children being raped by adult men but has also sought out others who share his sexual interest in children. According to Defendant's statements to the UC, he has encouraged others to sexually exploit children by discussing and sharing child pornography and has attempted to meet other offenders who have access to children so that they can sexually abuse the children together. Defendant told

---

[6] The government understands that Defendant may be in the process of retaining counsel. As of this filing, the government is unaware of any release plan that Defendant intends to propose. In any event, the government objects to Defendant's release under any conditions.

16

the UC in this case that he had participated in the sexual abuse of an eighteen-month-old boy during a sexual encounter with the boy's father and also suggested that he had sexually abused children "abroad," encouraging the officer to go abroad with him. Defendant also expressed a sexual interest in the UC's purported eight-year-old daughter.

Defendant did not give a second thought to sharing hardcore child pornography with a stranger. He knew his conduct was illegal, and so he sought to conceal his identity and then to try to cover his tracks. The totality of his conduct and personal circumstances demonstrates that he is an unmitigable danger to the community and a serious risk of flight. There is no condition or combination of conditions that could reasonably assure community safety or Defendant's return to Court were he to be released. This Court should detain him pending trial.

## Conclusion

For the foregoing reasons, the government respectfully requests that this Court detain Defendant Matthew Norman Ballek pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

Dated: February 9, 2024   By:   /s/ *Karen Shinskie*
Karen Shinskie
D.C. Bar No. 1023004
Paul V. Courtney
D.C. Bar No. 1034252 / N.Y. Bar No. 5392337
Assistant United States Attorneys
United States Attorney's Office for the
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7688 (Shinskie)
(202) 252-1719 (Courtney)
Karen.Shinskie@usdoj.gov
Paul.Courtney@usdoj.gov